UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CLARENCE A. SIMS,

                    Petitioner,

v.                                                    CASE NO. 04-CV-73998-DT
                                                      HONORABLE VICTORIA A. ROBERTS
MARY K. BERGHUIS,

                    Respondent.
_____/


## OPINION AND ORDER GRANTING
## PETITION FOR WRIT OF HABEAS CORPUS

          This matter is pending before the Court on Petitioner's application for the writ of habeas

corpus under 28 U.S.C. § 2254.  The Court concludes that Petitioner's Fourteenth Amendment

right to equal protection of the law was violated during *voir dire* proceedings.  Further, the Court

finds that his Fifth Amendment right to an attorney was violated before trial.  Accordingly, the

writ will issue unless the State takes steps to retry Petitioner within ninety days.

## I.  Background

          Petitioner was charged in 1997 with first-degree criminal sexual conduct and assault with

intent to commit great bodily harm less than murder.  During his trial in Saginaw County Circuit

Court, the trial court held hearings on Petitioner's claims that (1) the prosecutor used peremptory

challenges in a discriminatory manner to eliminate African Americans from the jury and (2)

Petitioner's pretrial statement to the police was involuntary and unlawful because the police

ignored his request to call his aunt, who is an attorney.  The trial court rejected Petitioner's

claims.  On September 15, 2000, the jury found Petitioner guilty of criminal sexual conduct in

the second degree, MICH. COMP. LAWS §750.520c(1)(f), and assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84. The trial court sentenced Petitioner to prison for concurrent terms of 3½ to 15 years for the criminal sexual conduct conviction and 3½ to 10 years for the assault conviction.

Petitioner reiterated his claim concerning the prosecutor's peremptory challenges in a motion for new trial. At a hearing on that motion, the trial court rejected the claim without explanation. Petitioner raised his habeas claims in an appeal of right. The Michigan Court of Appeals affirmed his convictions. *See People v. Sims*, No. 235999 (Mich. Ct. App. Feb. 11, 2003). On July 28, 2003, the Michigan Supreme Court denied leave to appeal. *See People v. Sims*, 469 Mich. 863; 666 N.W.2d 674 (2003) (table).

Petitioner filed his habeas corpus petition on October 13, 2004. The petition alleges:

(1) Petitioner was deprived of an impartial jury because three prospective jurors stated during *voir dire* that they knew Petitioner through their employment;

(2) the prosecutor improperly excluded all but one African American from the jury; and

(3) the trial court violated Petitioner's right to due process by admitting in evidence his videotaped confession to the police.

On December 6, 2006, this Court dismissed Petitioner's first claim on the merits and scheduled an evidentiary hearing on the second and third claims. An evidentiary hearing was held on May 24, 2007, and June 1, 2007. Counsel for Petitioner stated at the hearing that he did not quarrel with the Court's denial of Petitioner's first claim. The Court now proceeds to discuss and resolve Petitioner's second and third claims, using the following standard of review.

## II.  Standard of Review

Petitioner is entitled to the writ of habeas corpus if he can show that the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. at 413.

## III.  The Prosecutor's Peremptory Challenges

Petitioner, an African American, alleges that the prosecutor violated his right to equal protection of the law by using peremptory challenges to eliminate six of seven African Americans from the jury.  Petitioner contends that the prosecutor gave no reason for excusing one African American and he provided superficial reasons for excusing five others.

### A.  The state court proceedings

Petitioner first raised this issue in a motion for mistrial at the conclusion of *voir dire*.  He initially stated that the prosecutor used five of his eleven peremptory challenges to excuse

African Americans. He argued that the prosecutor's use of one-half of his peremptory challenges against African Americans was designed to produce an all-white jury. The prosecutor responded that he had not used one peremptory challenge and, if his strategy was to have an all-white jury, he would have used his last peremptory challenge to excuse the remaining African American on the jury. The prosecutor went on to provide specific reasons for exercising peremptory strikes against five African Americans.

The trial court responded to the prosecutor's explanations by stating, "There is a record. I'll deny the motion." (*Voir Dire* Transcript, at 85.) Defense counsel then corrected his earlier statement and said that the prosecutor had used six, not five, of his eleven peremptory challenges to excuse African Americans. As defense counsel started to enumerate the juror numbers of the excused African Americans, the trial court interrupted him and said, "The record is there. We'll take a break, then I'll blast into my opening instructions." (*Id.*)

Petitioner renewed his argument in a motion for new trial. At a hearing on the motion, he reiterated that the prosecutor had excused six out of seven African Americans as jurors. The trial court denied Petitioner's motion without providing Petitioner the opportunity to make a record and without offering any explanation for its ruling on the issue. (Tr. Dec. 18, 2000, at 3-5.)

Petitioner also challenged the prosecutor's use of peremptory challenges in his appeal of right. The Michigan Court of Appeals cited state law and then analyzed the claim as follows:

> In this case, the prosecutor articulated race-neutral reasons for exercising his peremptory challenges. He excused jurors based on a misdemeanor criminal conviction, an occupation, an expressed belief, and the desire to have a corrections officer seated on the jury. These reasons are valid and race neutral. Further, no questions or statements made during voir dire support an inference of discrimination that negates the prosecutor's race-neutral explanations.
>
> Additionally, the prosecutor did not use all his peremptory challenges and

accepted a jury that included an African-American juror, which militates against a finding of purposeful discrimination. We find the trial court properly determined that the prosecutor provided race-neutral explanations for using peremptory challenges to excuse prospective jurors who were African-American.

*Sims*, Mich. Ct. App. No. 235999, at 3 (internal citations omitted).

### B. The Alleged Failure to Develop the Facts in State Court

At the evidentiary hearing, the State argued that Petitioner failed to develop the factual basis for his claim in state court and, therefore, he was precluded from submitting new evidence. It is true that a federal court generally may not hold an evidentiary hearing if the petitioner "failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2).[1] Stated differently, new evidence can be the subject of an evidentiary hearing in federal court generally only if the prisoner was not at fault in failing to develop that evidence in state court. *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (*per curiam* opinion).

The Court finds that Petitioner was prevented from developing pertinent facts in state court. The trial court interrupted his attorney when the attorney attempted to make a record following *voir dire*. The trial court also denied Petitioner an opportunity to make a record at the

---

[1] An exception exists when

(A) the claim relies on--

    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2).

hearing on Petitioner's motion for new trial.  Therefore, Petitioner is not at fault for failing to develop the factual basis for his claim in state court.

### C.  *Batson v. Kentucky*

"It is settled that the Constitution's guarantee of equal protection ensures that a party may not exercise a peremptory challenge to remove an individual on account of that person's race." *McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 521 (6th Cir. 2001).  In other words, the Equal Protection Clause prohibits prosecutors from  "challeng[ing] potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

### 1.  Step 1 - A Prima Facie Showing

In *Batson*, the Supreme Court "outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause." *Hernandez v. New York*, 500 U.S. 352, 358 (1991).  "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Id.* To establish a *prima facie* case of purposeful discrimination during the selection of a jury,

> the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."  Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury . . . raises the necessary inference of purposeful discrimination.

*Batson*, 476 U.S. at 96 (internal citations omitted).

6

Petitioner established a *prima facie* case of racial discrimination during *voir dire*. As an African American, Petitioner is a member of a cognizable racial group. Second, he is entitled to rely on the fact that prosecutors sometimes use peremptory challenges in a discriminatory manner. Finally, the fact that the prosecutor excused six of seven African Americans from the venire establishes an inference that the prosecutor used his peremptory challenges to exclude prospective jurors on the basis of race.

## 2. Step 2 - The Prosecutor's Burden

If a defendant succeeds in making a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race, "the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." *Hernandez*, 500 U.S. at 358-59. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id*. at 360. The prosecutor does not have to provide a persuasive or plausible explanation. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995).

The prosecutor informed the trial court that: (1) he excused one African American juror because the juror's nephew was a defense attorney and the juror initially stated that a victim had to resist for the assault to constitute criminal sexual conduct; (2) he excused a second African American on the basis of a misdemeanor conviction; (3) he excused a third African American because the juror was a social worker for youth, and he thought that the juror might be inclined to believe young people such as Petitioner; and (4) he struck two additional African Americans not because of their race, but because he anticipated that a correctional officer would be seated as a juror if the two African Americans were excused. (*Voir Dire* Tr. at 84-85). These

explanations are racially neutral and valid on their face.

### 3.  Step 3 - Showing Pretext

The third step of the *Batson* inquiry requires the challenging party to "demonstrate that the purported explanation is merely a pretext for a racial motivation." *McCurdy,* 240 F.3d at 521. "Because the primary defense to pretext based violations of *Batson* is the [trial] court's ability to assess the credibility of an attorney's representations, it is critical that the [trial] court independently assess the proffered justifications." *Id.* (citing *Hernandez,* 500 U.S. at 365). "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

Then "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 359; *see also Jordan v. Lefevre*, 206 F.3d 196, 201 (2d Cir. 2000) (explaining that *Batson* "imposes a duty on the trial court to make a determination whether the defendant established intentional discrimination"). "[A] state court's finding of the absence of discriminatory intent is a 'pure issue of fact' accorded significant deference." *Miller-El v. Cockrell*, 537 U.S. at 339 (explaining the conclusion of a plurality of the  Court in *Hernandez*).

### a.  The State Court Rulings

The trial court omitted the third *Batson* step at Petitioner's trial.  When defense counsel attempted to respond to the prosecutor's explanations, the trial court interrupted him and stated that a record had been made.  The court did not allow Petitioner to rebut the prosecutor's explanations, and it made no findings about the credibility of the prosecutor's explanations.  It

also did not analyze whether Petitioner had shown purposeful discrimination by the prosecutor.

> As in *Jordan v. Lefevre*,
>
> the limited record developed in the present case casts doubt on the trial court's ability to make the required finding regarding the prosecutor's intent, thereby undermining the deference due its conclusion. *See Brown v. Kelly*, 973 F.2d 116, 122 (2d Cir.1992).
>
> The trial judge in this case made no effort to comply with the letter, much less the spirit, of *Batson*. Rather, he engaged in a perfunctory exercise designed to speed the proceedings along. . . . This does not constitute a meaningful inquiry into the question of discrimination.

206 F.3d at 201.

The state appellate court's analysis was not much better. The court of appeals stated that the prosecutor's explanations were valid and race neutral and that "no questions or statements made during voir dire support[ed] an inference of discrimination that negate[d] the prosecutor's race-neutral explanations." *Sims*, Mich. Ct. No. 235999, at 3. The court of appeals determined that the prosecutor's failure to use all his peremptory challenges and his acceptance of a jury that included an African American militated against a finding of purposeful discrimination.

### b. Analysis of the Prosecutor's Explanations

The Court may grant the writ of habeas corpus only if "it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 543 U.S. 333, __, 126 S. Ct. 969, 974 (2006). When making this determination, the Court must consider all the evidence on the record. *Riley v. Taylor*, 277 F.3d 261, 279 (3d Cir. 2001).

### Clarence Montgomery, Juror #86

The prosecutor allegedly excused Clarence Montgomery, Juror #86, because Mr. Montgomery was the uncle of a defense attorney and he believed that a victim of a criminal

sexual conduct offense should resist. The evidence established that the victim did resist. Moreover, some Caucasian jurors initially held the same view that a victim should resist, and two of them (Jean Conley, Juror #20 and Linda Halliday, Juror #45) sat on the jury. (*Voir Dire* Tr., at 37-38.) Furthermore, Mr. Montgomery stated that he could be an objective juror and follow the trial court's instructions. (*Id*. at 25 and 37-38.) He also stated that one of his nephews was a prosecutor (*id*. at 34), a fact that weighed in favor of keeping him on the jury. Because the principal difference between Mr. Montgomery and the other jurors arguably was his race, the credibility of the prosecutor's explanation for Mr. Montgomery is weakened. *Jordan v. Lefevre*, 206 F.3d at 201.

### Fronie Garner, Juror #35

The prosecutor claimed to excuse Fronie Garner because she was a social worker and he thought she would be sympathetic to young people, such as Petitioner. "Occupation is a permissible reason to defend against a *Batson* challenge, and being a social worker could be a legitimate basis to strike a prospective juror." *Hall v. Luebbers*, 341 F.3d 706, 713 (8th Cir. 2003). However, the complainant was several years younger than Petitioner. This fact -- and the additional fact that the complainant could have been perceived as a victim -- belie the prosecutor's argument that Garner was challenged because of sympathy toward young people like Petitioner.

The prosecutor stated at the evidentiary hearing that he did not think Garner would be a good juror even though the victim was younger than Petitioner. However, a vague musing about whether an individual would make a good juror "simply does not suffice to explain a peremptory challenge questioned under *Batson*." *Turner v. Marshall*, 121 F.3d 1248, 1253 (9th Cir. 1997).

**Billie Nelson, Juror #90, and Joseph Brown, Juror #10**

The prosecutor allegedly excused Billie Nelson and Joseph Brown to make room for a correctional officer that he wanted on the jury. He informed the trial court that he would have excused Nelson and Brown regardless of their race in order to have a correctional officer on the jury. He reiterated this sentiment at the evidentiary hearing in this Court when he stated that he wanted the correctional officer on the jury because of her gender and her occupation.

The prosecutor could have accomplished the same result by eliminating two Caucasians. In fact, he admitted at the federal evidentiary hearing that, although he could have eliminated any two jurors, he eliminated two African Americans. He further testified that he did not excuse two Caucasians because he was happy with the other jurors. He did not say why he was satisfied with the other jurors, but not Nelson and Brown, and "a party cannot insulate an explanation from appellate review simply by couching it 'in vague and subjective terms.'" *Id.* at 1254 (quoting *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994)).

**Sandra Dey, Juror #25, Shila Casey, Juror #15, and Lena Hubbert, Juror #54**

The prosecutor stated at trial that he excused Juror #25, Sandra Dey, because she had a prior misdemeanor conviction. Ms. Dey, however, signed an affidavit stating that she is Caucasian and has not been convicted of a misdemeanor. Respondent's attorney speculated at the federal evidentiary hearing that the prosecutor's explanation for Ms. Dey was meant for Shila Casey, Juror #15, an African American who was excused by the prosecutor and who has a misdemeanor conviction. A misdemeanor conviction is a race-neutral explanation, *see McNair v. Campbell*, 416 F.3d 1291, 1311-12 (11th Cir. 2005), *cert. denied*, __ U.S. __, 126 S. Ct. 1828 (2006), and the prosecutor stated at the federal evidentiary hearing that his practice is to

eliminate prospective jurors who have criminal records.

Even assuming, however, that the prosecutor's explanation for excusing Shila Casey was legitimate, the prosecutor offered no explanation at trial for excusing Lena Hubbert, Juror #54, who is an African American. The prosecutor stated at the federal evidentiary hearing that he did not think Hubbert was an African American, but the trial court never allowed defense counsel to make a record of the jurors whom Petitioner suspected were excused on the basis of race. Petitioner might have been able to establish Hubbert's race and show that the prosecutor excused her for discriminatory reasons had he been given the opportunity.

**D. Conclusion on the *Batson* claim**

The exclusion of even one juror for impermissible reasons violates *Batson*. *Coulter v. Gilmore*, 155 F.3d 912, 919 (7th Cir. 1998) (citing *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 142 n.13 (1994)); *McNair v. Campbell*, 416 F.3d at 1311. Furthermore,

> each piece of evidence should not be reviewed in isolation . . . . In short, "[a] reviewing court's level of suspicion may . . . be raised by a series of very weak explanations for a prosecutor's peremptory challenges. The whole may be greater than the sum of its parts."

*Riley*, 277 F.3d at 283 (quoting *Caldwell v. Maloney*, 159 F.3d 639, 651 (1st Cir. 1998)).

The prosecutor's explanations for excusing Clarence Montgomery, Fronie Garner, Billie Nelson, and Joseph Brown were weak when viewed in light of the record as a whole. And, the sum of the explanations suggests that the prosecutor's explanations for excusing those prospective jurors were pretextual. "The fact that one or more of [the] prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason." *McClain v. Prunty*, 217 F.3d 1209, 1221 (9th Cir. 2000). "Therefore, the state court's implicit factual finding that the prosecutor had no impermissible motive is not entitled to any

presumption of correctness." *Garrett v. Morris*, 815 F.2d 509, 514 (8th Cir. 1987).

The fact that the prosecutor left one African American on the jury, even though he had one remaining peremptory challenge, is not controlling; "'a consistent pattern of official discrimination' is not 'a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.'" *Batson*, 476 U.S. at 95 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 n.14 (1977)). In other words,

> [t]he discrimination condemned by *Batson* need not be as extensive as numerically possible. A prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities.

*United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir. 1991); *accord Lancaster v. Adams*, 324 F.3d 423, 434 n. 2 (6th Cir. 2003) (stating that "the presence of one or more African-American venire members on the jury, standing alone, does nothing to preclude a valid claim under *Batson*"); *United States v. Harris*, 192 F.3d 580, 587 (6th Cir. 1999) (stating that "the presence of one African-American on the jury does not preclude a *Batson* challenge").

The Court concludes that it was unreasonable for the state courts to credit the prosecutor's race-neutral explanations for the *Batson* challenge. It was also contrary to *Batson* for the trial court to omit the necessary third step of the *Batson* inquiry. There was not even "a 'terse,' 'abrupt' comment that the prosecutor . . . satisfied *Batson*." *Riley v. Taylor*, 277 F.3d at 291 (internal citations omitted). In the court's haste to complete review of Petitioner's *Batson* claim, it failed to protect Petitioner's right to equal protection of the law. A "judge may not . . .

so restrict defense counsel's arguments that the accused suffers the loss of an impartial jury at trial. The accused should not lose such a fundamental right because a trial judge is impatient." *Jordan v. Lefevre*, 206 F.3d at 198.

Furthermore, *Batson* errors are structural errors and not subject to harmless error analysis. *United States v. McFerron*, 163 F.3d 952, 956 (6th Cir. 1998). Therefore, the Court grants a conditional writ of habeas corpus on Petitioner's *Batson* claim.

## IV. Petitioner's Confession

Petitioner alleges that the trial court violated his constitutional rights by admitting his videotaped confession in evidence. According to Petitioner, he had been awake all night, he had been drinking much of the night, and he was inexperienced with the police. He also alleges that he was not permitted to call home even though he informed the police that his aunt was an attorney and was residing in his household.

Respondent's attorney maintained at the evidentiary hearing that Petitioner was precluded from presenting any new evidence in support of this claim because he failed to develop the facts in the state court. Counsel stated that Petitioner failed to raise his claim in his habeas petition, his motion for new trial, in the Michigan Court of Appeals, and in a motion to remand for an evidentiary hearing.

Petitioner did not raise his Fifth Amendment claim in his motion for new trial or in an appellate motion to remand the case to the trial court for a hearing. However, he did raise the claim during trial, and the trial court held an evidentiary hearing on the issue during the trial. Thus, there was no reason for Petitioner to seek an evidentiary hearing on the issue post trial or while the case was pending on appeal.

Petitioner did assert a factual basis for his Fifth Amendment claim in the Michigan Court of Appeals. Although his attorney did not cite *Miranda v. Arizona*, 384 U.S. 436 (1966), or related cases in his appellate brief, he did say:

> when Mr. Sims asked to make a telephone call to his relatives he was told he could do so **after** they were done with the questioning. It is also worth noting that the relative Mr. Sims wished to speak with was his Aunt, Ms. Eva Culberson Matthews, an attorney licensed by the State of Michigan to practice law.
>
> . . . . Mr. Sims was under arrest and was not allowed to telephone his Aunt, who is an attorney. For these reasons this Court should find that statements made by Mr. Sims were not voluntary, and should be suppressed upon retrial.

*Sims*, Mich. Ct. App. No. 235999, Brief on Appeal, at 18 (emphasis in original, footnote omitted).[2] The Michigan Court of Appeals addressed the voluntariness of Petitioner's statements to the police and Petitioner's allegation that "he told the police his aunt was an attorney and he wanted to contact her." *Sims*, Mich. Ct. App. No. 235999, at 4.

Finally, in his habeas petition, Petitioner provided the following facts in support of his claim that the trial court erroneously admitted his videotaped confession to the police:

> Most importantly, the defendant's aunt was residing with him over the summer and is a licensed attorney within the State of Michigan (Eva Culberson-Matthews P-30902). Defendant did repeatedly ask to call home, told one of the officers that he had an attorney within the household (admittedly off the tape) and he did not believe the defendant, and Attorney Matthews came to assist the defendant as soon as he was allowed to call over twelve hours later and she also represented the defendant at District Court arraignment. The defendant was questioned over four hours in a time span of about eight hours. It was about twelve hours after arrest that defendant was allowed to call home.

Pet. at unnumbered page 6.

Petitioner attached his state court brief to his habeas petition, and Respondent has not

---

[2] Petitioner made the same argument in the Michigan Supreme Court.

alleged that Petitioner failed to exhaust state remedies for his claim.  In fact, she stated in her answer to the habeas petition that she would assume Petitioner was making the same arguments that he made in the Michigan Supreme Court.  The Court concludes that Petitioner raised his claim at all levels of state court review and that the Court was not precluded from holding an evidentiary hearing on his claim.

### A.  Legal Framework

#### 1.  Involuntary Confessions and Due Process

"[A] confession cannot be used if it is involuntary."  *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (citing *United States v. Washington*, 431 U.S. 181, 186-87 (1977), and *Michigan v. Tucker*, 417 U.S. 433, 440-41 (1974)).  However, "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process . . . ."  *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989).  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

Courts must look to the totality of the circumstances when determining whether a confession has been elicited by unconstitutional means.  *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).  "Factors considered in assessing the totality of the circumstances include the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep."

*McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir.), *cert. denied*, __ U.S. __, 127 S. Ct. 510 (2006).

## 2. The Fifth Amendment Rights to an Attorney and to Remain Silent

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination." *Miranda*, 384 U.S. at 444.

> [T]he following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning.*

*Id.* at 444-45 (emphasis added). "An individual need not make a pre-interrogation request for a lawyer," although "such request affirmatively secures his right to have one . . . ." *Id*. at 470. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id*. at 473-74.

The Supreme Court explained in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), that

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

The Supreme Court clarified the holdings in *Miranda* and *Edwards* by stating that, "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation

without counsel present, whether or not the accused has consulted with his attorney." *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

### B. The Facts Established at the State Court Hearing

Detective Michael Hosh testified at the state court hearing on the voluntariness of Petitioner's confession. He testified that he interviewed Petitioner at approximately 10:30 a.m. on July 5, 1997 at the public safety office of Buena Vista Township. Petitioner was around twenty-two years of age at the time. Detective Hosh advised Petitioner of his *Miranda* rights, which he appeared to understand. Petitioner then waived his rights. According to Detective Hosh, no tricks, force, coercion, or deceit were used to make Petitioner waive his rights, and he did not appear to lack sleep or food or to be under the influence of medication or controlled substances. In fact, Petitioner appeared alert and cognizant of what Detective Hosh was saying.

The first interview lasted about two hours. After a break of about three hours during which Petitioner was kept in a holding cell, Detective Hosh interviewed Petitioner a second time. Detective Hosh reiterated Petitioner's constitutional rights at 3:03 p.m., and Petitioner waived his rights after indicating that he understood them and wanted to speak with the officers. Detective Hosh stated that Petitioner did not appear to lack food or medical attention, and he did not request any. He also did not appear to lack sleep or to be under the influence of intoxicants or controlled substances. Although Petitioner indicated he wanted to call relatives to determine how they were doing, Hosh testified that Petitioner did not indicate that he needed to call someone to obtain advice or counsel.

Petitioner testified at the state evidentiary hearing that he had been awake fifty-two hours at the time of his arrest and he did not sleep in the holding cell at the public safety building. He

claimed that he was intoxicated when he signed the two waivers of his constitutional rights, but he admitted on cross-examination that he may have been more sober before the second interview and that he was able to walk, talk, carry on a conversation, and formulate answers to questions. Petitioner further testified that he informed Detective Hosh several times that he wanted to make a telephone call, although he did not mention his aunt by name. Detective Hosh assured him that he could make a call after their interview.

When asked to clarify his testimony, Petitioner stated that as soon as he was allowed outside his cell, he told Officer Baker that he wanted to make a telephone call. He informed Baker that his aunt was an attorney and that she was at home, but neither Baker nor Officer Pellerito, who was standing by Baker, believed him. They told him that they did not need his people there and that they would get to that later.

The trial court viewed a videotape of the two interviews and stated at the conclusion of the evidentiary hearing that, although Petitioner had asked to speak with relatives who were in town, there was no mention of the fact that the relatives were attorneys and Hosh told Petitioner that he could speak with his relatives. The trial court ruled that Petitioner's statement to the police was admissible. (Tr. Sept. 13, 2000, at 11.)

The videotape of Detective Hosh's interviews with Petitioner was played for the jury. The interviews were not transcribed. However, the prosecutor revealed some of their content in his closing argument.[3] According to the prosecutor, Petitioner acknowledged being with the complainant on the night in question, but he initially denied using a belt on her. Petitioner later

---

[3] Petitioner made similar observations about the tape in his application for leave to appeal in the Michigan Supreme Court. *See* Application for Leave to Appeal, Mich. Sup. Ct. No. 123394, at 3 n.1.

said that he used a belt to push the complainant away when she attacked him.  He offered a third

explanation by stating that the complainant liked it.  And although Petitioner denied sexually

penetrating the complainant during most of the interview, by the end of his statement he said,

"Maybe I did; maybe I didn't."

### C.  The Court of Appeals Decision

The Michigan Court of Appeals acknowledged in its decision that the right against

compulsory testimonial self-incrimination is protected by the United States Constitution.  The

state court then enumerated factors to consider when determining whether a statement is

voluntary and went on to say that Petitioner's confession was voluntary:

> Defendant was twice advised of his *Miranda* rights and waived them.  Defendant
> had the opportunity to sleep between interviews -- that he did not sleep does not
> render his confession involuntary.  The questioning of defendant was not
> prolonged and was videotaped.  Importantly, the trial court viewed the videotape
> of defendant's confession and found it voluntary.  Additionally, while defendant
> claimed he told the police his aunt was an attorney and he wanted to contact her,
> the videotape showed otherwise, and defendant admits as much in his brief on
> appeal.

*Sims*, Mich. Ct. App. No. 235999, at 4 (footnote omitted).  The court of appeals concluded that

"the trial court properly determined that defendant's confession was voluntary because defendant

was not compelled to provide a statement to the police implicating himself in the assault."  *Id.*

### D. The Evidentiary Hearing in this Court

Petitioner testified at the evidentiary hearing that he was arrested early on July 5, 1997, and placed in a holding cell at the Buena Vista Police Department for over three hours. When Sergeant James Baker released him from the holding cell around 10:00 a.m., Petitioner asked to make a telephone call. This was before Petitioner went into the interview room which was adjacent to the holding cell. No video-taping had begun. Petition told Sergeant Baker that he wanted to call his aunt and that his aunt was an attorney. Baker and another officer, who was dressed in plain clothes and whom Petitioner later learned was Scott Pellerito, responded by making sarcastic remarks. They said such things as, "Yeah, right, your aunt is an attorney just like I'm related to Santa Claus and the Easter Bunny."

Detective Michael Hosh interviewed Petitioner from about 10:30 to 11:30 a.m. Sergeant Baker was present during the interview. He asked Hosh if he could make a telephone call, but he did not tell Hosh that he had asked Baker for an attorney. A second interview occurred after a break of about three hours. Hosh advised him of his rights at both interviews, and he waived his rights both times. He reached his aunt about 7:00 p.m. on the same day when an officer at the Saginaw County Jail helped him to make the call. He saw his aunt about an hour after speaking to her.

Eva Culberson Matthews testified that she was Petitioner's aunt and that she had been licensed to practice law in Michigan on July 5, 1997. She went to the Saginaw County Jail after learning that Petitioner had been arrested. She possessed a State Bar card at the time, but she had to go home to get a State Bar Directory, because the police did not believe she was an attorney. She left the jail about 10:00 or 11:00 p.m. and then asked an officer why the police had

not let Petitioner speak to her.  The officer said that they did not believe she was an attorney.

On the following day (Sunday, July 6, 1997), she spoke to the police at the Buena Vista Police Department where Pellerito was in charge.  An officer said that he was sorry they did not find her name in the Bar Directory.

Ms. Matthews further testified that she was within a ten-mile radius of Petitioner on the day of his arrest and that she represented him at his arraignment on Monday, July 7, 1997. Detective Hosh told her then that they did not have any proof she was an attorney and that was why they did not let her speak to Petitioner.  It was clear to Ms. Matthews from her conversations with Petitioner, Detective Hosh, and Chief Pellerito that Petitioner had attempted to call her and  had made it known to them that his aunt was an attorney.

Scott Pellerito testified at the hearing that he was Director of Public Safety and Chief of Police for Buena Vista Township in 1997 and that Officer Baker worked for him at the time. Chief Pellerito denied being present in Buena Vista on July 5, 1997, and he did not recall ever hearing of Eva Culberson Matthews.  This testimony was consistent with an affidavit that Chief Pellerito submitted to the trial court during trial.

Sergeant James Baker testified that he arrested Petitioner on July 5, 1997, and placed him in a holding cell at the Buena Vista Police Department.  He attended Detective Hosh's first interview with Petitioner.  During the interview, Petitioner was read his constitutional rights and he waived them.  He did not ask to speak with an attorney during the interview.  Sergeant Baker claimed that he did not see Scott Pellerito that day, and he did not recall Petitioner asking for an attorney or anyone asking to get in touch with Petitioner.

Detective Michael Hosh of the Michigan State Police testified that he did criminal

investigations and assisted local police in 1997.  He interviewed Petitioner two times on

Saturday, July 5, 1997, once at 10:00 a.m. and again at 3:00 p.m.  Petitioner was advised of his

*Miranda* rights and given a written copy of the rights, which included the right to an attorney.

Petitioner expressed no hesitation in talking with him.  Although Petitioner asked to call home to

find out how his people were doing, he was not specific.  He asked to speak with a relative, but

he did not say that he wanted to contact an attorney or that his aunt was an attorney.

Detective Hosh further testified that he first heard of Eva Matthews on the day of

Petitioner's arraignment, which was July 7, 1997.  Hosh also testified that he did not see Scott

Pellerito on July 5, 1997, and that Sergeant Baker was present during Hosh's first interview with

Petitioner and part of the second interview.

### E.  Analysis

#### 1.  The Due Process Claim

Petitioner concedes that food was offered to him on the day of his arrest, and he admitted

at the state evidentiary hearing that he might have been sober by the time of his second

interview.  Although Petitioner may have been tired, Detective Hosh testified in state court that

Petitioner was alert, responsive to questions, and did not give the appearance of being

incapacitated.  Petitioner was given an opportunity to sleep between interviews, and although he

testified that he had only a concrete slab on which to sleep, Detective Hosh thought that

Petitioner had a cot or bed and a bathroom facility.  The record does not support Petitioner's

contention that he suffered from a condition or deficiency that impaired his cognitive or

volitional capacity to the extent that his confession was involuntary and its admission a violation

of due process.

## 2. The Fifth Amendment Claim

The more troubling question is whether Petitioner's Fifth Amendment rights to remain silent and to have an attorney present during the custodial interrogation were violated. Petitioner does not deny that he was advised of his constitutional rights or that he waived his rights during his two interviews with Detective Hosh. However, he testified that he asked Sergeant Baker for permission to call his aunt, who was an attorney, *before* Detective Hosh interrogated him. Because it is undisputed that Baker was present during Detective Hosh's first interview with Petitioner, Baker's knowledge of Petitioner's request can be imputed to Hosh, who proceeded with the interrogation despite Petitioner's request.

The Court finds Petitioner's testimony to be credible. It was specific, and both the nature and detail of his allegations were such that the Court does not believe he fabricated them. Moreover, his testimony is bolstered by the testimony and affidavit of his aunt, attorney Eva Culberson Matthews. Ms. Matthews testified in this Court and asserted in a signed affidavit dated September 11, 2000, that law enforcement officials, including Michael Hosh and Scott Pellerito, told her they refused to permit Petitioner to consult her before interrogating him because they did not believe she was a lawyer.

Although Petitioner requested permission to call an attorney before his *Miranda* rights were read to him, "the Fifth Amendment's implied right to counsel was triggered because [he] was . . . subjected to custodial interrogation." *Abela v. Martin*, 380 F.3d 915, 925 (6th Cir. 2004). After Petitioner made his request to call an attorney, the police were required to avoid questioning him until he had an opportunity to consult the attorney. *See id*. at 927. This conclusion "is not altered by the fact that, after requesting counsel, [Petitioner] was read his

*Miranda* rights, signed a waiver of them, and proceeded to make a statement . . . ." *Id.* "[W]hen

a suspect invokes his Fifth Amendment right to counsel, police questioning must cease until

counsel is present. A suspect may waive his Fifth Amendment right to counsel and the *Edwards*

protections after counsel has been requested, but only if the suspect himself has initiated the

conversation or discussions with the authorities." *Id.* (citing *Minnick*, 498 U.S. at 155-56).

Petitioner did not initiate the interviews with Detective Hosh. Rather, Hosh initiated both

interviews, read the *Miranda* rights to Petitioner, and then questioned Petitioner.

> The Supreme Court explained in *Arizona v. Roberson*, 486 U.S. 675 (1988), that

>> the bright-line, prophylactic *Edwards* rule protects against the inherently
>> compelling pressures of custodial interrogation by creating a presumption that any
>> subsequent waiver of the right to counsel at the authorities' behest was coercive
>> and not purely voluntary. *Id.* at 685-86, 108 S. Ct. 2093. Moreover, the Supreme
>> Court expressly rejected the contention that the fresh issuance of *Miranda*
>> warnings, after the suspect requested counsel, would overcome the pressures
>> created by the custodial nature of the situation. *Id.* at 686, 108 S. Ct. 2093; *see
>> also United States v. Hall*, 905 F.2d 959, 961, 964-65 (6th Cir. 1990), *cert.
>> denied*, 501 U.S. 1233, 111 S. Ct. 2858, 115 L.Ed.2d 1025 (1991) (holding that
>> once an accused expresses a desire to deal with police only through counsel, a
>> presumption is created that any subsequent waiver of the right to counsel at the
>> authorities' behest is coercive and not purely voluntary; invoking *Roberson* in
>> rejecting the proposition that "a fresh set of *Miranda* warnings would 'reassure' a
>> suspect who had been denied counsel" that "his rights would remain
>> untrammeled.").

*Abela v. Martin*, 380 F.3d at 927.

> Petitioner's Fifth Amendment rights to counsel and to remain silent were violated.

Therefore, the trial's court's admission of Petitioner's statements and the state appellate court's

rejection of Petitioner's claim resulted in decisions that are contrary to, or unreasonable

applications of, clearly established federal law as determined by the Supreme Court.

### F. Harmless Error Analysis

The Court must review the other evidence against Petitioner to determine whether the

admission of his statements to the police was harmless. *Arizona v. Fulminante*, 499 U.S. 279,

310 (1991). The test on habeas review of constitutional errors is whether the error had a

"substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507

U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This test

applies "whether or not the state appellate court recognized the error and reviewed it for

harmlessness . . . ." *Fry v. Pliler*, __ S. Ct. __, __, No. 06-5247, 2007 WL 1661463, at *6 (U.S.

June 11, 2007).

The Michigan Court of Appeals summarized the testimony at trial as follows:

> This case arises out of an incident that occurred on the evening July 4,
> 1997 continuing through the early morning hours of July 5, 1997. Defendant and
> [the complainant] went out that night. Defendant rented a room at the Knights Inn
> in Buena Vista Township. Once in the motel room, both defendant and [the
> complainant] drank alcohol, and defendant repeatedly invited [the complainant] to
> join him in the hot tub. She refused. After some time, as [she] tried to leave the
> room, defendant put his belt around her neck and tightened it. Defendant pulled
> her to the hot tub and began putting her head under water until she blacked out.
> Later, after [the complainant] regained consciousness, defendant ordered [her] to
> take her clothes off and then penetrated her in the hot tub. He then pulled her
> toward the bed.
>
> Based on a guest's complaint, a motel desk clerk called 911 to request a
> police officer go to defendant's room. When the police arrived at the motel,
> defendant answered the door and was not wearing any clothes. [The complainant]
> came running at the police wearing only panties. [She] was crying hysterically,
> appeared very frightened, and stated that defendant tried to kill her and had raped
> her. The police observed that [the complainant's] eyes were swollen and
> protruding, and she had a red mark around her neck. Defendant was arrested . . . .

*Sims*, Mich. Ct. App. No. 235999, at 1.

There was no scientific evidence tying Petitioner to the sexual assault, and he did not

testify at trial.  His defense was that there was reasonable doubt as to whether sexual penetration occurred and whether a belt was used as a dangerous weapon.  In his statements to the police, Petitioner initially denied penetrating the complainant.  Upon further questioning, he ultimately said, "Maybe I did; maybe I didn't."  Although the jury acquitted Petitioner of first-degree criminal sexual conduct, which requires penetration, *see* Mich. Comp. Laws § 750.520b(1), Petitioner's admission that he may have penetrated the complainant established the element of sexual contact, which was necessary to find him guilty of second-degree criminal sexual conduct.  *See* Mich. Comp. Laws § 750.520c(1).

The other charge against Petitioner was assault with intent to commit great bodily harm less than murder.  As noted, the complainant testified that Petitioner put a belt around her neck, tightened it, and dragged her to the hot tub where he forced her on top of him and put her head under water.

In his initial statement to the police, Petitioner denied using a belt on the complainant. However, he subsequently informed the police that he used the belt in self defense.  He later offered a third explanation and said that the complainant liked it.  Petitioner's contradictory and implausible comments to the police could have led the jury to question the credibility of his defense.  After all,

> [a] confession is like no other evidence.  Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . .  [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.  Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."  *Bruton v. United States,* 391 U.S., at 139-140, 88 S.Ct., at 1630 (White, J., dissenting).  *See also Cruz v. New York,* 481 U.S., at 195, 107 S.Ct., at 1720 (White, J., dissenting) (citing *Bruton* ).  While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when

> linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision. In the case of a coerced confession . . . , the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of [a] confession at trial was harmless.

*Arizona v. Fulminante*, 499 U.S. at 296.

Although the Court cannot say with certainty that Petitioner's admissions to the police persuaded the jury to convict Petitioner, they likely had a substantial and injurious effect on the jury's verdict. When, as here, a judge has grave doubt about the harmlessness of a constitutional error, the judge "should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.*, as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')," and "the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 435-36 (1995). Therefore, the Court concludes that Petitioner's confession was not harmless. Petitioner is entitled to relief on his second claim.

## V. Conclusion

The state court's adjudication of Petitioner's Fifth Amendment claim and his *Batson* claim was objectively unreasonable. Therefore, the application for a writ of habeas corpus is **GRANTED**. The State is ordered to release Petitioner unless it takes steps to retry him within ninety days of the date of this order.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: June 13, 2007

The undersigned certifies that a copy of this
document was served on the attorneys of record
by electronic means or U.S. Mail on June 13,
2007.

S/Linda Vertriest
Deputy Clerk